I've come down primarily to answer any questions that the Court may have, but I would like to make two quick points about the Jones Act issue and one quick point about the Vessel Owner issue at some point on the way. The first Jones Act point is this. The District Court entered summary judgment in this case about four months before the Supreme Court handed down its Stewart decision. And the decision changes the Jones Act landscape, or I guess seascape, for marine construction workers like Kevin Shearing. Prior to Stewart, some courts had held that marine construction workers weren't seamen either because they weren't hired as seamen per se, or because the barges on which they served weren't vessels of navigation, or because those barges were moored at the time of the And the point I want to emphasize at the outset is that the Stewart case, though it's limited on its facts to the vessel issue, actually debunks each and every one of those arguments. The Stewart case held that a marine construction worker just like Kevin Shearing, employed aboard a crane barge just like the William F., at a marine construction project materially identical to the one that Taylor was performing in Los Angeles Harbor, on protected waters just like Queensway Bay, could be a seamen, and therefore remanded its case back to the Second District, or First District, which ultimately concluded that he was a seamen as a matter of law. And in the process, Justice Thomas indicated that, quote, it seems a stretch of the imagination to class the deckhands of a mud ridge and the quiet waters of a Potomac Creek with the bold and skillful mariners who abreast the angry waves of the Atlantic, but such and so far-reaching are the principles of admiralty that that's exactly what the Jones Act does. And that is the essence of the error that the District Courts made in this case. Now, when the Supreme Court restated the essential requirements for seamen status between 1991 and 2005, it specifically, to quote Justice O'Connor, eschewed the temptation to create detailed and self-executing tests, and instead it handed down two, quite frankly, vague and very broad requirements. And those requirements I would respectfully submit are not only more than ecumenical enough to embrace a gentleman like Kevin Shearing, but they are very rarely amenable to summary judgment. And the District Court decided that it was compelled to enter summary judgment in this case because it felt, and I quote, that it was obliged to do so by the Cabral decision, this Court's Cabral decision, which the District Court decided, quote, comes as close to a factually comparable situation as one is likely to find in the law. Well, we disagree adamantly with that. First of all, Cabral was handed down eight years before Stewart. And if you look at it very carefully, I think the result in Cabral is very, very hard to square with the result in Stewart. But I don't have to ask this Court to reconsider or reverse Cabral because Cabral is distinguishable on its facts. The logic in Cabral is a little bit opaque. The Court was not exactly clear whether it was relying on the duration element of the substantial connection requirement or the nature element. But I think that any conscientious reading of the case has to agree that it was relying, in fact, on both. Unlike Kevin Shearing, whom Traylor Brothers admits satisfies the substantial and duration requirement, the Seaman in Cabral worked 18 months for Healy Tibbets and during that time divided his employment between what the Ninth Circuit referred to as land-based and sea-based assignments. Well, given that terminology, the only sea-based assignment that showed up on the record was his assignment to the barge. But more than that, it was clear that that assignment, though he spent 90 percent of his time aboard the barge during that assignment, that assignment was only five weeks out of handed down as the gold standard or the rule of thumb that applies to the duration element. Beyond that, this Court has made it specifically clear twice, both in the Cabral decision and in the DeLange decision, that the barge never went anywhere while Mr. Cabral was aboard. Indeed, the DeLange case made it quite clear that Mr. Cabral only served aboard the barge 538 while it was stationary, that is firmly tied up to the pier that it was building. But we don't have that here. What we have here is a gentleman who not only served aboard the William F. while it was fleeting back and forth, which is something that the Supreme Court in Stewart made quite clear was to be regarded as navigation, but he served aboard it when it was under tow by tugboat on at least three occasions. And beyond that, there is a statement in the record of deposition testimony from a gentleman who was one of his crewmates who said that in addition to those three tugboat moves, Mr. Schering was aboard while the barge was towed away from the project site entirely because of bad weather. Now, there was a panel. The duties, though, are pretty well restricted to the crane operation, weren't they? And they are, Your Honor, and that's a very good point because the only issue which is at issue here from the Jones Act standpoint is the substantial in nature requirement. The Supreme Court has made it abundantly clear time and time and time again that it is not the claimant's job description that is important, but his connection to the vessel. And his connection to the vessel has nothing whatsoever with his duties. It has to do with the nature of the perils that he faces. For example, the Supreme Court has considered five Jones Act cases during a 15-year period. Four of them, it reversed a summary judgment just like the one below and remanded the case to the district court. And in one of them, it actually upheld a summary judgment. The only case where the district court upheld a summary judgment on season status involved a Coast Guard documented able-bodied seaman who was a member of the Seaman's Union of the Pacific. That was John Papey. His duties did not save him from summary judgment. But in the Weilander case, the plaintiff was a sandblaster. In the Gazzone case, the plaintiff was a shipyard worker. In the Chandra's case, the plaintiff was an office worker. And in the Stewart case, the plaintiff was a marine construction hand and, in fact, an operating engineer just like Kevin Shearing. So it's obvious, and none of those people, by the way, had Coast Guard papers. None of those people were assigned from maritime unions. None of those people had duties that were traditionally related to seaman status. But all of them were allowed to put their case in front of a jury. The question here, and in fact, a panel that Judge Graber was on in the Gibson case, I thought summed it up remarkably well. This is an unpublished opinion in Gibson, but I would cite it just for the court's reference. Gibson spent- Not until after January 1st. All right. Well, then we'll assume that this didn't happen at Gibson, Your Honor, but there was a very learned opinion that suggested that Gibson spent most of his working hours aboard a floating platform but offered no evidence that he was on the barge while it was towed or otherwise endured the hazards of the sea. That's the key distinction here. Kevin Shearing, just like the plaintiff in DeLange, worked aboard the William F. while it was towed and underway, and therefore, was subjected to the characteristic perils of a seaman's work environment. We may disagree about that, but that's a question which only the jury can decide. If I may switch quickly to the downstream vessel owner issue. This is important because even if we are remanded, should the jury ultimately conclude that Mr. Shearing was not a seaman, I still believe that he has a tort claim against Taylor under Section 905B. Let me ask a factual question about that. Who owned the float? As I understand it, there was a- I don't know that the record is necessarily clear on that. I think one could certainly infer, and I think one would have to infer, that the float was owned by Traylor Brothers. The float was placed there by the Traylor Brothers Marine Superintendent, Ed Adair, and it was placed there solely to provide access to the vessel. Which brings me to the very point I wanted to make. The district court likened our vessel owner case to a case involving an injury on a dock. Well, Your Honor, there was no dock. That's why there was an injury. What we're talking about here, the float and the platform, are depicted on page 352 of the excerpts. And in fact, the William F., the vessel in this case, was anchored up to 200 yards offshore. And every day, the work crew would have to get from the beach out to the vessel. What we contend is that the turnover duty, at a minimum, requires the vessel owner to provide safe access to people who work aboard the vessel from the shoreline to the deck of the vessel. We're not asking the owner to guarantee that the dock is good. We're not asking the owner to guarantee that the trip from home down to the waterfront is safe. But once you get to the water's edge, which is exactly what we had here, we say that the turnover duty should, at the very least, require the owner to give reasonably safe access from the water edge to the vessel. Now, in this case, Mr. Shearing wasn't injured on a dock. He was literally injured knee-deep in Queensway Bay, trying to lift this defective ramp back onto, I beg your pardon, defective painter's pick, the gangway, back onto the float that Judge Fletcher just mentioned. And that is the only way that they could get out to the barge. Now, Judge, or Magistrate Zarefsky, concluded that the negligence in failing to provide a better gangway to the ramp was committed in Taylor's capacity as an employer. And he went through what some courts have referred to as mind games, dividing the employer up. I'd like to make two points about that. First of all, the cases on which Magistrate Zarefsky relied were the First Circuit's decision in Moorhead and the Second Circuit's decision in Gravatt. None of those cases, neither one of those cases, involved a breach of the turnover duty. What they both involved was a breach either of what is known as the active control duty or the duty to intervene. And, in fact, according to Gravatt itself, quote, the application of Cindy's second and third prongs, the active control duty and the duty to intervene, can be problematic with a harbor worker or contractor and the owner of the vessel or the same entity. But it went on to state, and I'm quoting now from 226F3 at 122, a breach of the turnover duty would always seem to constitute negligence in capacity as vessel and render the ship liable whether the contracting operations were carried out by an independent contractor or by the same entity as owns the vessel. So whereas here you're alleging, as we are, a breach of the turnover duty, that can only be breached qua vessel. More than that, the evidence in this case showed that the man who was responsible for providing access to the ramp and to the barge was the Marine Superintendent, Mr. Adair. There was also a land side superintendent with a wholly different area of responsibility. But Mr. Adair was not only the person who accepted the blame for coming up with this gangway solution, but who was produced as the 30B6 most qualified person to describe why Taylor permitted this gangway to remain in place for more than two and a half months, even though the crew complained about it every day. So when all is said and done, I think that the record, frankly, compels, but at least allows us to go back to a jury in the event that that jury finds that Mr. Schering is not a seaman, and place before them the question of whether or not the failure to respond to these complaints amounted to a breach of the turnover duty. I would, if I may, reserve any additional time unless the court has further questions. Good morning. Good morning. May it please the Court, Richard Wooten for appellees. At the outset, I'll indicate that I can't speak nearly as quickly as Mr. Hilsman can, so bear with me. I'll respond briefly to a couple of points he made at the very outset, because knowing Mr. Hilsman as long as I've known him and in dealing with this issue as many times as I have, what I've learned is he is an absolute master inciting half-truths, three-quarter truths, and I want to point just one of these out right at the outset. He indicated to your honors that everything changed when Stewart was decided. That's just not true. The Stewart court made it crystal clear that there was one issue only that they were addressing, and that was vessel status. Whether or not a dredge, not a construction barge, a dredge is a vessel. And the reason they did was because that was the only argument that was made by Dutra, the defendant in that case, on summary judgment. The quote that he read you comes from an 1896 case, and what he didn't quote for you was the introduction that the Supreme Court put in this case. The introduction reads, despite the seeming incongruity of grouping vessels alongside more traditional seagoing, excuse me, of grouping dredges alongside more seeming or traditional seafaring vessels under the maritime statutes, Congress and the courts had long done precisely that. And then they talked about what the sailor court had said back in 1896. Well, there were a tremendous number of changes in the definition of seamen status between 1896 and the time the Stewart court rendered its decision. The most significant being the Wielander and the Chandris cases. And it really is Chandris where we need to look in connection with this case because the issue there dealt with the issue here, whether or not there was satisfaction of the substantial in nature case. I'll talk about that in just a minute. Mr. Hilsman also argued that rarely do you see summary judgments granted on seamen cases. Wielander itself, in the Wielander case, the court said it's a mixed question of fact and law. And when the facts are undisputed, essentially, and the law is clear of one possible interpretation, summary judgment's appropriate. And that's what the Ninth Circuit has done on a number of occasions, which we have cited in our brief. The California Appellate Court has done it the first, second, fifth, many circuits on appropriate cases, appropriate facts have said this mixed question of fact and law can be decided on summary judgment. John pointed out that, wait a minute, the Supreme Court has reversed summary judgment on a number of occasions recently when they addressed the issue. And that's true. And the reason they did was not that there was a problem with the facts. The problem was with the test itself. So what they've done through the five cases since 1991 is honed the test so that they've jettisoned the requirement that there's aid to navigation shown on behalf of the injured worker. They have clarified what a vessel is. And they have made clear in Chandris that with respect to the substantial connection issue, you have to look at both a durational and a nature element. So do you agree with opposing counsel that really the crux of this case is the nature piece of that test? Absolutely. There is just no question about it. So that's, everything else is satisfied. That's where the argument is between the parties. Absolutely. Okay. And why, in your view, is there no issue of fact on that question? Well, what the judge did. Because we don't have to find in his favor. All there has to be is some issue of fact regarding the nature of the employment. Certainly. I understand. What the Chandris court said, just so we set the ground rules clear, is that, look, this is a status-based test. Land-based maritime workers don't become seamen because they happen just to be working aboard a barge when they're injured. And seamen don't lose the protection of seamen status when they're working on shore. We look at what their status is. They specifically rejected Justice Stevens' argument that any maritime worker who's ever aboard  that's not enough. They made it clear that the goal was to separate between sea-based maritime workers from land-based workers who only have a sporadic or transitory connection with a vessel and whose employment does not regularly expose them to the perils of the sea. Well, under that standard, why isn't the factual material cited by opposing counsel sufficient to demonstrate regular exposure to the perils of the sea? And I will address that in one second. There was one last thing that the Chandris court said that I think is very significant, and that is, you evaluate the total circumstances of employment to determine whether you had a connection to the navigation of vessels and the perils attendant thereto. What the evidence was in this case is that Mr. Schering was dispatched by a construction union to do a construction job. He did the same type of work aboard a platform which was anchored down at all times he was doing his task as a crane operator, and which had lines that permanently went to shore. This is not a vessel that is being navigated. The facts that were cited- The towing and so forth. There were three examples where he was aboard when the barge was being towed, but he wasn't working at the time. He was a mere passenger at that point in time, because his duties, when you look at the totality of circumstances, were precisely the same as those of Mr. Cabral. And that is, he was primarily there for one reason and one reason only, and that was- Cabral is different, at least insofar as the durational element is concerned. But the Cabral case was not decided on the durational element. If you read the case carefully, and I agree with Mr. Hilsman about this, it could have been better drafted. But what the Cabral court said at the outset is, we look, it looked right at the Chandra's decision and it said, for the connection issue, we look at two things. We look at whether or not there's a durational element, and we look at the nature issue. After that, though, the Cabral- Was there evidence in that case that the plaintiff was aboard the dredge, or whatever it was in that case, at times when it was, in fact, moving over to sea? I don't believe that there was evidence as to whether or not that occurred. The problem with Cabral is you need to look back to the district court decision to get some of the facts more specifically, because it was kind of a short circuit decision, if you will. But what was clear, just to rule out the durational element, the court mentioned it one time, and that's to say, look, you've got to look at both of these. That's what Chandra's has made clear for us. And then focus solely on the nature element. Okay. When you were saying one has to look back at the district court's opinion in Cabral, have you done that? I have. Okay. And so what do we know about whether there was evidence that Mr. Cabral was aboard when the vessel was moving across the sea? I don't recall specifically. I do not believe that there was evidence it was. But what the- And that's a distinction from this case. Sure. Three times in over a month, he was riding as a passenger, as opposed to performing construction operations. Having said that, I will say, I do recall from the Cabral district court decision that the court made it very clear that when you are working in protected harbors, the protected waters of Pearl Harbor, just as when you're looking at working in the protected waters of Long Beach Harbor, that's not exposure to the perils of the sea. So if the sole issue here is, on which you have concerns, is whether or not three crane movements when the barge is not actually anchored down over a course of a month is sufficient to raise a question of fact, I go back to what the Chandra's court said, which is when you look at the totality of circumstances, can you make a determination, status-based, what this gentleman's job was? He was a crane operator, working on a construction job, doing pile driving, whose responsibility was to operate the crane, the primary responsibility, which was admitted by Mr. Shearing, to pick up piles, move them into position, place them, and hammer them into place, precisely as was the situation with Mr. Cabral. They were from the same union. They both fell from a gangway. When Judge Zarefsky said that, indeed, you can't find a case more factually similar, I think he's right, with the exception, as you have pointed out, that on three occasions in a month, when the tug moved it from one position to another to reposition it for purposes of pile driving, he happened to be aboard. That is not, in our view, the regular exposure to the perils of the sea, which create a seaman by separating him from a land-based worker. I would cite, as well, Spears v. Kojima, where the California Appellate Court decided this issue. Again, same union. In fact, in this case, it was precisely the same barge. It was in the same harbor. Mr. Shearing, by coincidence, was the crane operator who was involved when Mr. Spears was injured. Are you going to devote any time to the longshoreman aspect of this case? Absolutely. I will turn to that now, because I think that is actually the easier one, if I may. The problem with the plaintiff's analysis here is that he is alleging a breach of the Cyndia turnover duty, saying that Trailer Brothers, acting in its vessel owner capacity, somehow breached a duty when it turned the William F. over to the construction crew at the start of the job. What the cases say is that to prove a violation of the turnover duty, you have to prove that the William F.'s, in this case, equipment, its tools, its hull, or its appurtenances were not reasonably safe. There's nothing about the William F. which caused this accident. What's an appurtenance? That is exactly the test. That's exactly right. It is something that is physically connected with or a part of the vessel equipment. An example, as far as you can get... It doesn't have to be physically connected, does it? No, no, that's right. I was going to say, the one example that is crystal clear here is that if you've got a barge tied up to a dock and you, as a vessel owner, have an obligation to provide to a seaman reasonably safe access, and to longshoremen generally as well, that if that gangway is unsafe, you may be found responsible. That's not what happened here. What Judge Zarefsky did is he said, when we have vessel owner-employer issues in the Cyndia situation, we have to consider this a dual-capacity case, because that's what it is, and we have to do this analysis of whether or not the vessel-owning employer was wearing its vessel owner hat or its construction employer hat. And one of the things you can do, according to the cases, is to say, okay, let's take a step back and think what hat he was wearing. The district court essentially adopted this approach. If we assume that Mr. Turing had been employed by a different entity than owned the William F., if that worker was hurt on land or trying to access a floating dock, and indeed that's exactly what it was, if he was hurt trying to get to that floating dock, the vessel owner wouldn't have any liability. They have no responsibility with respect to that dock. What they have responsibility, and I'm sorry I'm running out of time, what their responsibility is, is once the tender in this case is alongside or a skiff, they have responsibilities to make sure that they can get from the skiff up to the vessel by means of a reasonably safe appurtenance. I can't think of anything else. There isn't any case law that limits the responsibility of access to the skiff, is there? I beg your pardon? There isn't any case law that limits the responsibility with respect to access to the skiff part of the... You've got to go from the ramp down to the water, and then you've got to go from the water up to the vessel, but that's all part of access, isn't it? Well, certainly that's all part of access, but take, for example, a vessel that's six miles out at sea and they hire a company that provides marine electricians and say, you get it out there. You get them out there, and once you get them out there, then we'll get them up onto the vessel by means of the appurtenance of the gangway. That's perfectly reasonable. In fact, that's the way it happens. And so what Judge Zarefsky's saying is, look, you can't have unlimited responsibility on behalf of a vessel owner to ensure that from the time an employer, an employee of a different employer leaves the home that morning to drive to the work site to climb onto a skiff... Let's not get into that, but just tell me, who owned and controlled the float, or controlled the float? It was a Trailer Brothers piece of equipment. There's no question about that. And they had no responsibility to provide safe conduct until the guy got into the skiff? That's your position? I'm sorry, they had no responsibility? Until the individual entered the skiff. No, it absolutely did have responsibility to make sure that the access to that float was safe in its capacity as the gentleman's employer. Well, but they owned the vessel. Well, I understand, and believe me, that is exactly the difficulty that you see in the cases about this two-hat analysis. But that's exactly what the cases have said you have to do. You have to make a determination whether or not the alleged negligent act was committed by the vessel-owning employer acting in its capacity as the vessel owner, or acting in its capacity as an employer. And what I'm saying is there are no cases otherwise in which a third party employing a gentleman like this, that employee would be able to say, oh, I can sue the vessel owner because it didn't properly provide me safe access from the dock to a boarding float where I was going to get on to my third party employer's skiff to go out to the vessel. We have your position, and you've exceeded your time. Thank you. And I believe Mr. Hill can have some rebuttal time remaining. I have 2 minutes and 38 seconds left, Your Honor. Mr. Rudin thought I was speaking fast before I watched this. I have just four very quick points to make. The first is in response to Judge Graber's question about the record in Cabral. The record in Cabral is very clear. I've looked at the district court decision and at this Court's decision in Cabral and DeLange. The barge never moved, and I would specifically call this Court's attention to language at 183 F3rd at 920, where the DeLange Court says Cabral worked aboard the barge only when it was stationary. I would also call the Court's attention to the language at Cabral 128 F3rd at 1293, where this Court said, in fact, when the barge was used in another part of the harbor on a soil sampling project on the weekend immediately preceding the accident, Cabral was not aboard because the barge's crane was not used. It never moved. The other point I want to correct that Mr. Rudin indicated, he said that Mr. Shearing was only a passenger during these three tows. Wrong. The record is very clear, and the record is cited at page 11 of our brief, that Mr. Shearing remained aboard as the crane operator to lift, that is to weigh the anchors at the start of the voyage, to act as a lookout for the tugboat operator during the tows, and to drop the anchor at the end of the voyage. He was there as a crew member. That is absolutely clear from the record. Third, I wanted to address the suggestion that work in Long Beach Harbor does not expose this gentleman to the perils of the sea. Could he not be like suggesting that work on Lake Michigan doesn't expose people to the perils of the sea? Anybody who serves in a harbor, a tugboat hand, a ferryboat hand, fishermen, they're all classic seamen. That's not what the Court was talking about. The Court was talking about the characteristic perils of seaman status, which, as the unpublished Gibson decision made a point of, involves the movement of vessels. We've got that here. Turning very quickly and finally to the 905B points, again, because this is a breach of the turnover duty, we don't have to get into the schizophrenia. But just to indulge Mr. Wooten, imagine a situation where a vessel anchored 200 yards offshore and simply said to the longshoremen, come on aboard, and provided them with no access whatsoever. Clearly, anybody who's drowned or bitten by a shark or swept away in the current while swimming out to that vessel would be able to sue for breach of the turnover duty. This is essentially the same thing. We're talking about providing a reasonably safe access from the edge of the shore to the deck of the vessel. That's the breach. If the Court has any questions, I'd be happy to answer it. But I appreciate the attention you've given us. I think we don't have any further questions. Thank you both for your arguments. The case just argued is submitted.
judges: B. Fletcher, Cudahy , Graber